FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 01 2022

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

| | |
|---|---|
| IN RE: PROFEMUR HIP IMPLANT PRODUCTS LIABILITY LITIGATION | MDL NO. 2949<br>4:20-MD-2949-KGB |
| **CHRISTINE JACKSON,** | |
| **Plaintiff,**<br>v. | THIS DOCUMENT RELATES TO: |
| **WRIGHT MEDICAL TECHNOLOGY, INC.,** a Delaware corporation; and **MICROPORT ORTHOPEDICS, INC.,** a Delaware corporation. | Civil Action No.: 4:22-cv-315-KGB |
| **Defendant.** | **JURY TRIAL DEMANDED**<br>This case assigned to District Judge Baker<br>and to Magistrate Judge Harris |

## COMPLAINT

COMES NOW Plaintiff, Christine Jackson ("Plaintiff"), by and through her undersigned attorneys, and files this her Complaint for damages against Defendants, Wright Medical Technology, Inc., a Delaware corporation; and MicroPort Orthopedics, Inc., a Delaware corporation, and allege the following causes of action against Defendants, and each of them, as follows:

## NATURE OF THE ACTION

1.    Plaintiff was implanted bilaterally with the PROFEMUR® Total Hip System with PROFEMUR® Stem ("Stem") and PROFEMUR® CoCr modular neck

("modular neck") (collectively "the PROFEMUR® Total Hip System" or "the Device".

2.      Plaintiff underwent a right-sided total hip arthroplasty where the Profemur Total Hip System was implanted on November 27, 2013.

3.      Plaintiff underwent a left-sided total hip arthroplasty where the Profemur Total Hip System was implanted on May 23, 2014.

4.      Both the right-sided and left-sided Profemur Total Hip Systems have failed due to corrosion related adverse tissue reactions and both devices have been surgically removed.

5.      Defendants have long known that their Profemur Total Hip System design has an unacceptable tendency to fret and corrode at the location of the modular neck-stem-body junction during even low to moderate physical activity. Defendants have known for years that their Profemur– was prone to fail within a few years of implantation causing severe debilitating tissue destruction.  Significantly, consequent to reports of fretting corrosion and fracture at the stem and modular neck junction, Defendant MicroPort issued a recall and ceased marketing the Device.  As a result of the Device's defects and Defendants' tortious acts/omissions, Plaintiff Christine Jackson, and many other patients who received these devices, endured unnecessary pain and suffering; debilitating lack of mobility; and a subsequent more difficult revision surgery to replace the defective Device, giving rise to more pain

and suffering, prolonged recovery time, and increased risk of complications and death from surgery.

6.    This is an action for strict products liability, negligence, breach of express and implied warranties, fraudulent misrepresentation, fraudulent concealment, negligent misrepresentation, loss of consortium, and punitive damages brought by Plaintiff Christine Jackson for injuries arising out of the failure of the PROFEMUR® Total Hip System Plaintiff Christine Jackson received as part of her total hip replacement surgeries.

## PARTIES

7.    Plaintiff Christine Jackson, is a resident of Clermont, Lake County, State of Florida.  Plaintiff Christine Jackson underwent a right total hip arthroplasty surgery performed by Roswell Johnston, M.D. at Allen Hospital on November 27, 2013.   After the right-sided index surgery, Plaintiff underwent a left total hip arthroplasty surgery performed by Dr. Johnston on May 23, 2014.   During these surgeries, the PROFEMUR® Total Hip System manufactured, designed, distributed, labeled, marketed, and warranted by Defendants was implanted into Plaintiff Christine Jackson.  Plaintiff Christine Jackson's surgeon, medical staff, and other healthcare providers met or exceeded the standard of care applicable to the hip replacement surgeries.  The PROFEMUR® Total Hip System implanted bilaterally in Plaintiff failed, and necessitated revision surgeries.  At the time of Plaintiff's

3

index and revision surgeries, Defendants MicroPort Orthopedics, Inc. and Wright Medical Technology, Inc. marketed, promoted, and distributed the PROFEMUR® Total Hip System.

8. Defendant Wright Medical Technology, Inc. ("WMT," "Wright," or "Wright Medical") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Memphis, Tennessee, and as such is a citizen of both the State of Tennessee and the State of Delaware. Defendant WMT is registered to do business in the State of Florida and may be served with process by serving its registered agent for service, C T Corporation System, at 1200 South Pine Island Road, Plantation, Florida 33324. At all times relevant hereto, Defendant WMT conducted regular and sustained business in the State of Florida by selling and distributing its products in Florida and engaged in substantial commerce and business activity in the County of Lake.

9. Defendant MicroPort Orthopedics, Inc. ("MicroPort") is a corporation organized under the laws of the State of Delaware, with its headquarters and principal place of business located in Arlington, Tennessee, and as such is a citizen of the State of Tennessee and the State of Delaware. Defendant MicroPort is registered to do business in the State of Florida and may be served with process by serving its registered agent for service, C T Corporation System, at 1200 South Pine Island Road, Plantation, Florida 33324. At all times relevant hereto, Defendant

4

MicroPort conducted regular and substantial business in the State of Florida by selling and distributing its products in Florida and engaged in substantial commerce and business activity in the County of Lake.

## JURISDICTION & VENUE

10.    This Court has diversity jurisdiction pursuant to 28 U.S. C. §1332. The amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and cost, as this action involves a products liability claim by a severely injured party. There is complete diversity of citizenship between the parties.

11.    As material events that give rise to this action took place in the Southern District of Florida, and as Defendants did and continue to do business within the State of Florida and have continuous and systematic contacts with the State of Florida and have consented to jurisdiction in the State of Florida, venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §1391. Defendants are corporations and deemed to reside in a judicial district in which they are subject to personal jurisdiction. 28 U.S.C. §1391(c). As Defendants are subject to personal jurisdiction in Florida, and a substantial part of the events giving rise to this claim occurred in the Middle District of Florida, venue is proper in that Court. 28 U.S.C. §1391(a)(1).

12.    At all times relevant hereto, Defendants developed, manufactured, advertised, promoted, marketed, sold and/or distributed the defective Profemur® Total Hip System, including the Profemur® (cobalt chromium) neck and (titanium) femoral stem components, throughout the United States, including Florida.

13.    But for this Court's Case Management Order Number 1, entered on March 11, 2021, allowing for direct filing in the MDL Court, Plaintiff would have filed in the United States District Court for the Middle District of Florida.

## **FACTUAL ALLEGATIONS**

14.    PROFEMUR® modular necks were first marketed by Cremascoli Ortho ("Cremascoli"), a European medical device manufacturer in 1986.

15.    Since 1985, Defendant, Wright, directly or through its parent corporation, subsidiaries or affiliates, Wright Medical Group, Inc., Wright Medical Europe, S.A., Cremascoli Ortho, Wright Cremascoli Ortho, and others designed, manufactured, labeled, marketed, promoted, distributed and sold in the United States artificial hips with modular components.

16.    In December 1999, Wright acquired Cremascoli, its product lines, documents, and manufacturing facilities, including the Profemur® line of hip products.

17.    After the acquisition of Cremascoli, Wright re-designed the Profemur® modular artificial hip stem and modular neck, expanded the product line to include

6

additional titanium models or versions of Profemur® stems and Profemur® modular necks, and rebranded the Cremascoli titanium modular neck product line, and compatible titanium artificial hip stems, as the Wright Profemur® Total Hip System.

18.    By way of what is known as Section 510(k) premarket notification process, on December 13, 2000, Wright received clearance from the U.S. Food and Drug Administration (FDA) to distribute in the United States its first titanium modular neck and stem artificial hips.

19.    The FDA never approved the safety or effectiveness of Wright's newly rebranded hip implant system and product line of modular necks, but instead merely accepted Wright's assertion that the Profemur® Hip System was substantially equivalent to an already legally marketed device (i.e., the Cremascoli modular neck component acquired by Wright in December 1999).

20.    The 510(k) clearance process is distinct from the FDA pre-market approval (PMA) process in that clearance does not require clinical confirmation of safety and effectiveness and as such the manufacturer retains all liability for the assertions of safety and effectiveness.

21.    Sometime after December 13, 2000, Wright began to manufacture, label, market, promote, distribute and sell in the United States the hip implant devices branded as "Profemur® Total Hip System" under the 510(k) clearance, which included titanium stems and titanium modular necks.

7

22.    The Wright Medical Profemur® modular necks that were distributed by Wright after December 13, 2000, and before August 25, 2009, were all made of the titanium-aluminum-vanadium alloy known as Ti6Al4V.

23.    In the year 2000 and in all years thereafter to the present, Ti6Al4V was an alloy generally available for use in manufacturing implantable medical devices.

24.    In the year 2000 and in all years thereafter to the present, monoblock hip implant stems without modular neck-stem junctions were readily available in the market.

25.    In various marketing and promotional material published and distributed by Wright from approximately the year 2002, and into the year 2005, and available to Wright's sales representatives and distributors, surgeons, patients and the general public, Wright made the following representations, statements, claims and guarantees about its Profemur® modular necks:

> The modular neck used with the Profemur® hip has been employed by Wright Cremascoli for over fifteen years. The necks were designed in 1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures. The necks are used in other Wright Cremascoli hip systems besides the Profemur® hip. <u>None of the necks has experienced a clinical failure since their inception</u> [emphasis added].

> and

> The modular neck system, designed by Cremascoli in 1985 (U.S. Patent No. 4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty.

Extensive laboratory tests have proven that the coupling between the modular neck and femoral implant <u>guarantees</u>:

- Structural reliability
- <u>Absence of significant micromovement</u>
- <u>Absence of fretting corrosion</u>

[emphasis added].

[Wright Medical Technology Monograph MH688-102© 2004].

26.   On or about April 19, 2005, Wright first reported to the FDA a Profemur® modular neck clinical failure where a Ti6Al4V modular neck implanted in a patient experienced a catastrophic fracture (i.e., breaking into two pieces) due to fretting and corrosion at the oblong tapered distal end where the neck is seated in the stem.

27.   After receiving notice of the first modular neck fracture, Wright received notice of additional modular neck clinical failures from corrosion-based fractures of the modular necks.

28.   The number of Profemur® Ti6Al4V modular neck clinical corrosion-based fractures has continued to increase over time, and continues to increase to the present day, now numbering more than 800 such clinical failures.

29.   As the number of reported Wright Ti6Al4V modular neck fractures continued to increase and the FDA became aware of its dismal clinical performance, case studies appeared in medical journals reporting the fracture of Wright titanium

Profemur® modular necks and identifying micromotion and fretting corrosion at the neck-stem junction as the cause and mode of failure.

30.    At some point in time prior to August 25, 2009, Wright had notice that a higher than normal rate of early failure of its Profemur® line of hip implant devices were failing by fracture at the modular neck junction secondary to micromotion, fretting and corrosion.

31.    As the number of reported Wright Ti6Al4V Profemur® modular neck fractures continued to increase, Wright, rather than redesigning its hip implant system to eliminate the modular neck-stem junction and thereby eliminate micromotion, and fretting corrosion, instead began to design and develop a Profemur® modular neck made of a cobalt chrome (CoCr) metal alloy utilizing the same taper design as the titanium modular necks and the same Profemur® stems.

32.    On April 16, 2009, Wright submitted a Section 510(k) premarket notification of intent to market a device generally identified as Profemur® hip system modular necks made of a cobalt chrome alloy to the FDA to be coupled with existing Profemur® stems.

33.    On or about August 25, 2009, Wright began to market and offer for distribution and sale in the United States Profemur® modular necks made of cobalt chromium alloy, and Wright simultaneously began withdrawing from the market its Profemur® modular necks comprised of Ti6Al4V titanium alloy.

34.    Wright could have eliminated the potential for fretting and corrosion at the modular neck junction of its Profemur® hip implants by redesigning and/or abandoning modularity and manufacturing, designing, and marketing monoblock stems, but it chose not to do so because Wright did not want to lose its investment in the market share for the use of its modular stems in primary hip implant arthroplasties.

35.    In promoting its Profemur® CoCr modular necks, Wright claimed that the cobalt chrome modular necks would result in less fretting than occurred with Ti6Al4V modular necks.

36.    The design of the Profemur® CoCr modular neck, when coupled with the design of the titanium Profemur® hip stems, is such that it in fact promotes the process of fretting corrosion of more harmful metal particles at the modular neck-stem junction.

37.    The Profemur® CoCr modular necks that Wright designed and manufactured were designed to be used with most, if not all, of the same femoral heads and most, if not all, of the same Profemur® titanium hip Stems as were its titanium (Ti6Al4V) Profemur® modular necks.

38.    While promoting its Profemur® CoCr modular necks Wright Medical stated, "[p]roduct complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to

taper junction fretting and corrosion or fractures for Profemur® CoCr modular

necks." [See Profemur® CoCr Modular Necks Frequently Asked Questions, Wright

Medical publication MH 1619-812.]

39.    Wright's statement in its promotional materials that "[p]roduct

complaint data reported to Wright to date does not indicate an increased risk, as

compared to traditional titanium necks, of adverse events due to taper junction

fretting and corrosion or fractures for Profemur® CoCr modular necks," was not

supported by unbiased sound scientific testing.

40.    The claim by Wright that "[p]roduct complaint data reported to Wright

to date does not indicate an increased risk, as compared to traditional titanium necks,

of adverse events due to taper junction fretting and corrosion or fractures for

Profemur® CoCr modular necks" was false and/or misleading.

41.    While promoting its Profemur® CoCr modular necks, Wright claimed

that its CoCr modular necks would result in less fretting than occurred with titanium

modular necks.

42.    Claims by Wright that its CoCr modular necks would result in less

fretting than occurred with titanium (Ti6Al4V) modular necks were not supported

by unbiased, sound scientific testing.

12

43.     Claims by Wright that its CoCr modular necks would result in less fretting than occurred with titanium (Ti6Al4V) modular necks were false and/or misleading.

44.     The design of the Profemur® CoCr modular neck, when coupled with the design of the titanium (Ti6Al4V) Profemur® hip stems, is such that it in fact encourages the process of fretting corrosion at the modular neck-stem junction.

45.     Prior to offering its Profemur® CoCr modular necks for distribution or sale in the United States, neither Wright nor MicroPort adequately tested the design of CoCr Profemur® modular necks for fretting corrosion or the biological effects of cobalt and chromium corrosion, metal debris and metal ions on the body of patients.

46.     Prior to offering its Profemur® CoCr modular necks for distribution or sale in the United States, neither Wright nor MicroPort adequately tested the design of the CoCr Profemur® modular necks for corrosion or the biological effect of corrosion on the body after implantation in patients.

47.     Wright rushed the Profemur® CoCr modular necks to market without adequately testing it for in vivo performance, including, but not limited to, resistance to fretting and corrosion or the effects of corrosion on human tissue.

48.     Wright rushed the Profemur® CoCr modular necks to market in order to preserve market share and its profits from the sale of its failing Profemur® hip implant products.

49.     Years before Plaintiff Christine Jackson was implanted with the Device, Wright had been informed that the Profemur® CoCr modular necks were corroding in patients to the extent that revision surgeries were necessary to remove the Profemur® CoCr modular necks.

50.     In January of 2014, Wright sold the OrthoRecon Division, Wright's operating unit for the manufacture and sale of Wright's hip and knee implants, to MicroPort.

51.     MicroPort and Wright knew or should have known that as of November 27, 2013 and May 23, 2014, the dates Plaintiff Christine Jackson received her Wright Profemur® Total Hip implants that:

(a)     Wright and MicroPort had not adequately tested the Profemur® CoCr modular necks to simulate in vivo performance for resistance to fretting corrosion;

(b)     MicroPort had not adequately tested the Profemur® Total Hip System;

(c)     Wright and MicroPort had not adequately tested the Profemur® CoCr modular necks to simulate in vivo performance for resistance to corrosion;

(d)     The Profemur® CoCr modular necks would be subject to fretting corrosion;

14

(e)    There was an increased risk of fretting corrosion at the neck-stem junction;

(f)    There was an increased risk of corrosion at the neck-stem junction; and

(g)    There was a substantial risk that patients' bodies would be adversely affected by the exposure to corrosion, metal debris and metal ions secondary to cobalt and chromium fretting and corrosion.

52.    The Neck-Stem junctions of the Profemur® CoCr modular neck, coupled with a Profemur® titanium hip stem, are subject to significant movement which results in fretting corrosion, pitting corrosion, metal debris cast off and metal ion release.

53.    Product complaint data reported to Wright and MicroPort prior to July 11, 2017 indicated an increased risk of adverse events due to tissue exposure to metal debris and ion cast off from taper junction fretting and corrosion of the Profemur® CoCr modular necks when coupled with Profemur® titanium hip stems, as compared to traditional titanium necks or monoblock stems.

54.    Product complaint data reported to Wright and MicroPort prior to July 11, 2017 indicated an increased risk of adverse events due to corrosion, as compared to traditional monoblock stems or titanium necks when coupled with the Profemur® hip stems.

15

55.    Based upon what Wright and MicroPort knew or should have known before November 27, 2013 and May 23, 2014, Wright and MicroPort should have informed orthopedic surgeons using the Profemur® Total Hip Systems that there was an increased risk of fretting and corrosion for Profemur® CoCr modular necks when coupled with Profemur® titanium hip stems.

56.    The Profemur® CoCr modular neck, Profemur® titanium modular stem and the Profemur® Total Hip System are defective and unreasonably dangerous because of their design defects in that the harmful characteristics or consequences inherent in the product's use for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing the defective product in the body of Plaintiff Christine Jackson. Furthermore, the said devices were defective and unreasonably dangerous in that they failed to perform as an ordinary consumer would expect when they were used in a reasonably foreseeable manner.

57.    Additionally, the Profemur® CoCr modular neck, Profemur® titanium modular stem and the Profemur® Total Hip System implanted in Plaintiff Christine Jackson were defective in manufacture, as Wright manufactured same such that the tolerances between the stem and neck components did not comply with Wright's design specifications.

58.     Based upon the facts and allegations set forth above, the Profemur®
CoCr modular neck, Profemur® titanium stem, and the Profemur® Total Hip System
are defective and unreasonably dangerous in labeling in that they do not provide
adequate warnings of the dangers or information of said risks when the device is
used in a reasonably foreseeable manner.

59.     Based upon the facts and allegations set forth above, the Profemur®
CoCr modular necks, Profemur® titanium modular stem, and the Profemur® Total
Hip System are defective and unreasonably dangerous in that the risks that were
inherent in the product being used for hip replacement, when weighed against the
alleged utility or benefit derived from the product's use, outweigh the benefit.

60.     Defendants WMT and MicroPort were negligent and/or in strictly liable
in manufacture, distribution, sale, marketing, promotion, and labeling of the
Profemur® CoCr modular neck, Profemur® titanium modular stem, and the
Profemur® Total Hip System.

61.     Defendants were negligent and/or strictly liable in the failure to warn
patients and/or surgeons that it had received product complaint data that indicated
an increased risk of adverse events due to taper junction fretting and cobalt
chromium corrosion, as compared to other available safe alternative devices.

62.     Defendants were negligent and/or strictly liable in failing to warn
patients and surgeons that they had received product complaint data that indicated

an increased risk of adverse events due to corrosion, as compared to other available safe alternative devices.

## PLAINTIFF'S INJURIES AND DAMAGES

## PLAINTIFF CHRISTINE JACKSON'S PROFEMUR® HIP

63.     On or about November 27, 2013, Plaintiff Christine Jackson had a Profemur® Total Hip System implanted in her right hip ("Index Surgery") in a procedure known as a total hip arthroplasty (or "THA").

64.     On or about May 23, 2014, Plaintiff Christine Jackson had a Profemur® Total Hip System implanted in her left hip ("Index Surgery") in a procedure known as a total hip arthroplasty (or "THA").

65.     Orthopedic surgeon Dr. Johnston performed the both the left and right Index Surgeries during which he implanted the Profemur® Total Hip System in Plaintiff Christine Jackson.

66.     Plaintiff Christine Jackson's Index Surgeries was performed at Allen Hospital in Waterloo, Iowa.

67.     Dr. Johnston did not breach any generally accepted standard of care in the field of orthopedic surgery in his care and treatment of Plaintiff Christine Jackson or negligently cause any injury to Plaintiff in any of the following respects:

   (a)     In the care or treatment that he provided to Plaintiff Christine Jackson prior to beginning the hip implant surgeries;

(b)     In the hip implant surgeries he performed on Plaintiff Christine Jackson; or

(c)     In the care or treatment that he provided to Plaintiff Christine Jackson subsequent to Plaintiff's hip implant surgeries.

68.     Based upon the patient population that Wright and MicroPort intended the Device to be implanted in, at the time of Plaintiff Christine Jackson's Index Surgeries, she was an appropriate patient to be implanted with the Profemur® Total Hip System.

69.     Dr. Johnston recommended the Profemur Total Hip System to Plaintiff Christine Jackson and indicated that the Device was appropriate for her.

70.     Plaintiff Christine Jackson reasonably relied upon Dr. Johnston in deciding to proceed with hip replacement surgery and have the Profemur® Total Hip System implanted.

71.     Before or during the course of Plaintiff Christine Jackson's Index Surgeries, Defendants MicroPort and/or Wright arranged for the Profemur® Total Hip System that were implanted in Plaintiff to be delivered to Allen Hospital and/or Dr. Johnston for implantation in Plaintiff Christine Jackson.

72.     Defendants, directly or through their subsidiaries or affiliates, designed, manufactured, distributed, marketed, delivered and sold in the United States various

19

prosthetic orthopedic devices, including the Profemur® Total Hip System implanted in Plaintiff Christine Jackson during the Index Surgeries.

73.    At the Index Surgeries, each of the components of Plaintiff Christine Jackson's Profemur® Total Hip System were in substantially the same condition in all relevant respects as when they left Defendants' control.

74.    At all times relevant hereto, Plaintiff Christine Jackson used the Profemur® Total Hip Systems implanted during the Index Surgeries in a normal and reasonably foreseeable manner.

75.    On or about June 29, 2021, Plaintiff Christine Jackson reported to Dr. George Haidukewych, M.D. ("Dr. Haidukewych") for revision surgery of her failed left hip prosthesis ("Left Revision Surgery").  Dr. Haidukewych recommended the revision surgery after Plaintiff Christine Jackson presented with severe pain and lack of mobility.

76.    Plaintiff Christine Jackson's Left Revision Surgery was necessary because the Device failed due to corrosion at the neck-stem junction of the Device.

77.    But for the fact that the CoCr modular neck of Plaintiff Christine Jackson's left-sided Device had corroded causing it to fail and injure Plaintiff, Plaintiff's Device was not otherwise in need of revision.

78.    On or about June 29, 2021, it was discovered that the left-sided Device failed due to corrosion of the oblong taper of the Profemur® CoCr modular neck

where it seated in the pocket of the Profemur® titanium stem, which caused continuing and otherwise irreversible physical injury to Plaintiff Christine Jackson.

79.   On or about June 29, 2021, the Profemur® Total Hip System implanted in Plaintiff Christine Jackson's left hip was discovered to have failed as a direct and proximate result of the actions, conduct, negligence, and breach of duties of the Defendants, as alleged in this Complaint.

80.   On or about January 11, 2022, Plaintiff Christine Jackson reported to Dr. George Haidukewych, M.D. ("Dr. Haidukewych") for revision surgery of her failed right hip prosthesis ("Right Revision Surgery").   Dr. Haidukewych recommended the revision surgery after Plaintiff Christine Jackson presented with severe pain and lack of mobility.

81.   Plaintiff Christine Jackson's Right Revision Surgery was necessary because the Device failed due to corrosion at the neck-stem junction of the Device.

82.   But for the fact that the CoCr modular neck of Plaintiff Christine Jackson's right-sided Device had corroded causing it to fail and injure Plaintiff, Plaintiff's Device was not otherwise in need of revision.

83.   On or about January 11, 2022, it was discovered that the right-sided Device failed due to corrosion of the oblong taper of the Profemur® CoCr modular neck where it seated in the pocket of the Profemur® titanium stem, which caused continuing and otherwise irreversible physical injury to Plaintiff Christine Jackson.

84.    On or about January 11, 2022, the Profemur® Total Hip System implanted in Plaintiff Christine Jackson's right hip was discovered to have failed as a direct and proximate result of the actions, conduct, negligence, and breach of duties of the Defendants, as alleged in this Complaint.

85.    The Profemur® Total Hip System (and its components), to include the Devices implanted in Plaintiff Christine Jackson were not merchantable, but were defective and unreasonably dangerous for their intended and/or reasonably foreseeable uses in that:

(a)    they were and are defective and unreasonably dangerous under Florida's product liability law because of one or more or a combination of the following:

(i)    the necks were manufactured/designed in such a manner as to be subjected to excessive micromotion and fretting corrosion, thereby increasing the potential for failure;

(ii)    the necks were manufactured/designed in such a manner as to be subjected to excessive micromotion, fretting and corrosion, thereby increasing the potential for injury and failure;

(iii)    the surface of the section of the necks that were inserted into the modular stems were manufactured/designed in such a manner

22

as to increase the potential for fretting and corrosion, thereby increasing the potential for injury and failure;

(iv)    the portion of the necks that were inserted into the modular stem were in a narrow, confined space, thereby increasing the potential for fretting, corrosion, injury and failure;

(v)    the components were manufactured/designed in such a way as to make the modular neck components susceptible to micromotion, fretting and corrosion, thereby increasing the potential for injury and failure;

(vi)    the components were manufactured/designed in such a way as to cause dissimilar metals (i.e., a CoCr modular neck and titanium modular stem) to mate by insertion into a narrow, confined space, thereby increasing the potential for corrosion; and

(vii)    there may be other conditions or defects yet to be determined.

(b)    it was also defective and unreasonably dangerous in that the devices failed to perform as safely as an ordinary consumer would expect or was dangerous to an extent beyond which could be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics in that:

(i)    the ordinary consumer would not contemplate that the Device would become so corroded that premature revision surgery would become necessary less than five (5) years after implantation; and

(ii)    the ordinary consumer would not contemplate that the ordinary activities of daily living would result in the Device releasing harmful metal ions and metal debris in the consumer's body that caused adverse tissue reactions and other medical complications.

86.    The Device was not tested in design and development under conditions that were known would be encountered in the normal in vivo patient environment over reasonable periods of time.

87.    The Device was not tested in design and development under the normal in vivo patient environmental conditions that were known would be encountered during normal use of the Device.

88.    The Device was not tested for the FDA Section 510(k) Premarket Notification Process under conditions that were known would be encountered in the normal in vivo patient environment.

89.    The testing performed by Wright and MicroPort of the Device did not adhere to or meet FDA guidance.

90.    The Device's design was known by Defendants to be failing from fretting and corrosion of the modular Neck-Stem junction prior to the day of its FDA 510(k) Premarket Notification Application.

91.    The Device was known by Defendants to be failing at higher than expected rates from micromotion, fretting and corrosion of the modular neck-stem junction prior to the date of its implantation in Plaintiff Christine Jackson during the Index Surgery.

92.    The Device's design was known by Defendants to be failing at higher than expected rates due to fretting and corrosion prior to the dates of Plaintiff Christine Jackson's Revision Surgeries, during which the Devices were discovered to be corroded at the neck-stem junction.

93.    Prior to the Index Surgeries, Defendants did not warn patients, surgeons, customers, or their sales representatives/distributors that the Device was known to be failing from corrosion at higher than expected rates.

94.    Plaintiff Christine Jackson's Devices failed due to corrosion as a result of one or more or a combination of the foregoing unreasonably dangerous conditions.

95.    As a direct and proximate result of the failures of the Profemur® Total Hip Systems, Plaintiff Christine Jackson has sustained injuries and damages, including, but not limited to:

25

(a)    undergoing surgery to remove and replace the failed devices and repair the damage the failures caused;

(b)    past and future pain, suffering, and anguish, both in mind and in body;

(c)    permanent diminishment of her ability to participate in and enjoy the affairs of life;

(d)    medical bills associated with the revision surgeries rehabilitation, and recovery therefrom;

(e)    future medical expenses;

(f)    disfigurement; and

(g)    physical impairment.

(h)    serious and permanent physical injuries to bone, muscle, tendons, tissues and nerves in her hips and pelvis;

(i)    loss of earnings and any decrease in earning power or capacity in the future.

## FEDERAL STATUTORY AND REGULATORY REQUIREMENTS

96.    Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. 21 U.S.C. § 351.

26

97.    Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof.  21 U.S.C. § 352.

98.    Pursuant to federal law, manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prohibit introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices.   In particular, manufacturers must keep records and make reports if any medical device may have caused or contributed to death or serious injury, or if the device has malfunctioned in a manner likely to cause or contribute to death or serious injury. Federal law also mandates that the FDA establish regulations requiring a manufacturer of a medical device to report promptly to FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation of federal law by which a device may present a risk to health.  21 U.S.C. § 360(i).

99.    Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation (including a process to assess the performance of a device, but not including an evaluation of the

safety or effectiveness of a device), packaging, storage and installation of a device conform to current good manufacturing practice, as prescribed in such regulations, to assure that the device will be safe and effective and otherwise in compliance with federal law.

100. The regulations requiring conformance to good manufacturing practices are set forth in 21 C.F.R. § 820, *et seq.* As explained in the Federal Register, because the Current Good Manufacturing Practice ("CGMP") regulations must apply to a variety of medical devices, the regulations do not prescribe the details for how a manufacturer must produce a device. Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the devices designed and manufactured and the manufacturing processes employed. Manufacturers must adopt current and effective methods and procedures for each device they design and manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

101. Pursuant to 21 C.F.R. § 820.1(c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under section 501(h) of the Federal Drug & Cosmetic Act ("the Act"). 21 U.S.C. § 351.

102. Pursuant to 21 C.F.R. § 820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed

or manufactured. "Quality system" means the organizational structure, responsibilities, procedures, processes, and resources for implementing quality management. 21 C.F.R. § 820.3(v).

103. Pursuant to 21 C.F.R. § 820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

104. Pursuant to 21 C.F.R. § 820.30(a), each manufacturer shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

105. Pursuant to 21 C.F.R. § 820.30(d), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

106. Pursuant to 21 C.F.R. § 820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

107. Pursuant to 21 C.F.R. § 820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

29

108.   Pursuant to 21 C.F.R. § 820.30(g), each manufacturer shall establish and maintain procedures for validating the device design.  Design validation shall be performed under defined operating conditions on initial production units, lots or batches, or their equivalents.  Design validations shall ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

109.   Pursuant to 21 C.F.R. § 820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

110.   Pursuant to 21 C.F.R. § 820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review and approval of design changes before their implementation.

111.   Pursuant to 21 C.F.R. § 820.70(a), each manufacturer shall develop, conduct, control and monitor production processes to ensure that a device conforms to its specifications. Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications.  Such process controls shall include:

30

(a)    documented   instructions,   standard   operating   procedures ("SOPs") and methods that define and control the manner of production;

(b)    monitoring and control of process parameters and component and device characteristics during production;

(c)    compliance with specified reference standards or codes;

(d)    the approval of processes and process equipment; and

(e)    criteria   for   workmanship   which   shall   be   expressed   in documented standards or by means of identified and approved representative samples.

112.    Pursuant to 21 C.F.R. § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification, method, process, or procedure.

113.    Pursuant to 21 C.F.R. § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control system(s) to verify that the system, including necessary equipment, is adequate and functioning properly.

114.    Pursuant to 21 C.F.R. § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by

substances that could reasonably be expected to have an adverse effect on product quality.

115.    Pursuant to 21 C.F.R. § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning, and use.

116.    Pursuant to 21 C.F.R. § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

117.    Pursuant to 21 C.F.R. § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer shall validate computer software for its intended use according to an established protocol.

118.    Pursuant to 21 C.F.R. § 820.72, each manufacturer shall ensure that all inspection, measuring and test equipment, including mechanical, automated or electronic inspection and test equipment, is suitable for its intended purposes and is capable of producing valid results.  Each manufacturer shall establish and maintain

procedures to ensure that equipment is routinely calibrated, inspected, checked and maintained.

119.   Pursuant to 21 C.F.R. § 820.75(a), where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures. "Process validation" means establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications. *See* 21 C.F.R. § 820.3(z)(1).

120.   Pursuant to 21 C.F.R. § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met. Each manufacturer shall ensure that validated processes are performed by qualified individuals.

121.   Pursuant to 21 C.F.R. § 820.90, each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements.

122.   Pursuant to 21 C.F.R. § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventive action.   The procedures shall include requirements for:

(a)    analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product or other quality problems;

(b)    investigating the cause of nonconformities relating to product, processes and the quality system;

(c)    identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

(d)    verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

(e)    implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

(f)    ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

(g)    submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

123.    Upon information and belief, the Profemur® Total Hip System is adulterated pursuant to 21 U.S.C. § 351 because, among other things, it failed to

34

meet established performance standards and/or the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

124. Upon information and belief, the Profemur® Total Hip System is misbranded because, among other things, it is dangerous to health when used in the manner prescribed, recommended, or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

125. Upon information and belief, the Profemur® Total Hip System is adulterated pursuant to 21 U.S.C. § 351 because Wright and MicroPort failed to establish and maintain CGMP for the Profemur® Total Hip System, including components, in accordance with 21 C.F.R. § 820, *et seq.*, as set forth above.

126. Upon information and belief, Wright and MicroPort failed to establish and maintain CGMP with respect to the quality audits, quality testing and process validation for the Profemur® Total Hip System, including its components.

127. As a result of Wright's and MicroPort's failure to establish and maintain CGMP as set forth above, the Profemur® Total Hip System was defective and failed, resulting in injuries and damages to Plaintiff Christine Jackson.

128. If Wright and MicroPort had complied with the federal requirements regarding CGMP, the Profemur® Total Hip System would have been manufactured

and/or designed properly such that it would not have resulted in injuries to Plaintiff Christine Jackson.

129.  Plaintiff Christine Jackson's injuries and damages were both factually and proximately caused by the defective Profemur® Total Hip System.

130.  Plaintiff Christine Jackson's injuries were both factually and proximately caused by the unreasonably dangerous Profemur® Total Hip System.

131.  Plaintiff Christine Jackson further shows that she is entitled to recover for all noneconomic and compensatory damages allowed by law, including, but not limited to, pain and suffering for all pain and suffering that she has incurred as a result of the defective product, the follow-up surgeries, rehabilitation, and constant pain that occurs as a result of the failure of the Device.

## FIRST CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT
### (As to all Defendants)

132.  Plaintiff hereby realleges and incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 131, inclusive, as though fully set forth herein.

133.  At all times relevant hereto, Defendants Wright and MicroPort designed, manufactured, distributed, sold, marketed and/or promoted the Profemur® Total Hip System, including the 1) Profemur® PHA00266 Plasma Z Stem, 2) Profemur® PHA00264 Plasma Z Stem 3) Profemur® PHAC1252 8° var/val CoCr

36

Modular Femoral Neck, 4) Profemur® PHAC1212 8A/R V/V CoCr Modular Femoral Neck 3) 38CH3800 Ceramic Femoral Head that were implanted in Plaintiff Christine Jackson during her two index surgeries.

134.   At all times relevant hereto, the Profemur® Total Hip System was expected to, and did, reach prescribing physicians and consumers, including Plaintiff Christine Jackson and Plaintiff's physician, without a substantial change in the condition in which it was sold.

135.   At all times relevant hereto, Plaintiff and Plaintiff's healthcare providers used the Profemur® Total Hip System for its intended or reasonably foreseeable purpose.

136.   At all times relevant hereto, the Profemur® Total Hip System was defective and unreasonably dangerous.  Such defects included, but were not limited to, a tendency to (a) generate dangerous and harmful metal debris in the patient's body; (b) corrode; (c) cause pain; (d) inhibit mobility; (e) require revision surgery; and (f) fracture.

137.   Plaintiff is informed and believes, and thereupon alleges, that the Profemur® Total Hip System implanted in Plaintiff is defective and unreasonably dangerous because of a manufacturing defect in the alleged device, as aforesaid, which contains a condition that the manufacturer did not intend and, as a result, failed to perform as safely as an ordinary consumer would expect when the product

is used in a reasonably foreseeable manner and/or because it differed from the manufacturer's design and specifications, or from typical units of the same product line.

138.   As a direct, legal, proximate and producing result of the defective manufacture of the Profemur® Total Hip System implanted in Plaintiff, Plaintiff sustained injuries and damages as set forth above, for which said Defendants are strictly liable.

139.   The dangerous, unsafe, and defective manufacturing of the Profemur® Total Hip System implanted in Plaintiff Christine Jackson was a substantial factor in causing Plaintiff's injuries and damages as set forth above, for which the said defendants are strictly liable.

## SECOND CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY – FAILURE TO WARN
### (As to All Defendants)

140.   Plaintiff repeats, realleges and hereby incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 131 above, inclusive, as though fully set forth herein.

141.   The Profemur® Total Hip System was defective and unreasonably dangerous when it left the possession of Defendants in that it failed to provide adequate warnings to alert the medical community and patients, including Plaintiff and Plaintiff's healthcare providers, to the dangerous risks associated with the

Profemur® Total Hip System when used for its intended and reasonable foreseeable purpose. The dangers and risks included, but were not limited to, a tendency to (a) generate dangerous and harmful metal debris in the patient's body; (b) cause injury and pain; (c) inhibit mobility; (d) require revision surgeries; and (e) fracture.

142. At all times relevant hereto, Plaintiff and Plaintiff's healthcare providers used the Profemur® Total Hip System for its intended or reasonably foreseeable purpose.

143. Plaintiff and Plaintiff's healthcare providers could not have discovered any defect in the Profemur® Total Hip System through the exercise of due care.

144. Defendants knew or should have known, through complaint data and knowledge of the design's history, by the use of generally recognized and prevailing scientific/ technical/ medical knowledge available at the time of the said product's distribution, that a foreseeable use of the product may be unreasonably dangerous without adequate warnings of the danger(s) posed potential risks and side effects associated with the Profemur® Total Hip System. Defendants knew or should have known of the defective condition, characteristics, and risks associated with the Device as previously set forth herein.

145. The warnings and instructions provided with the Profemur® Total Hip System by Defendants did not adequately warn of the potential risks and side effects

of the Profemur® Total Hip System, which risks were known or scientifically knowable to Defendants.

146.    Defendants had a continuing duty to warn the medical community and public, including Plaintiff and Plaintiff's healthcare providers, of the potential risks and increased failure rate associated with the Profemur® Total Hip System.

147.    As a direct, legal, proximate and producing result of Defendants' failure to warn, Plaintiff sustained the injuries and damages as set forth above, for which said defendants are strictly liable.

148.    Defendants' failure to adequately warn of the potential risks and side effects of the Profemur® Total Hip System was a substantial factor in causing Plaintiff's injuries and damages as set forth above, for which said defendants are strictly liable.

## THIRD CAUSE OF ACTION

### NEGLIGENCE
### (As to All Defendants)

149.    Plaintiff hereby realleges and incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 131, inclusive, as though fully set forth herein.

150.    At all times relevant hereto, Defendants designed, manufactured, distributed, sold, marketed and/or promoted the Profemur® Total Hip System for implantation into customers, such as Plaintiff, by physicians and surgeons in the U.S.

151.   At all times relevant hereto, Defendants knew or should have known that the history and novel design of the Profemur® Total Hip System necessitated clinical trials and other pre-marketing evaluations of risk and efficacy.  Such testing would have revealed the increased risk of failure and complications associated with the Profemur® Total Hip System.  A reasonable manufacturer under the same or similar circumstances would have conducted additional testing and evaluation of the Profemur® Total Hip System's safety and performance prior to placing the Profemur® Total Hip System into the stream of commerce.

152.   At all times relevant hereto, Defendants knew or should have known of the serious complications and high failure rate associated with the Profemur® Total Hip System.  Despite receiving hundreds of reports of serious complications from healthcare providers, Defendants chose (1) not to discontinue or redesign the Device; (2) not to perform any additional testing of the Profemur® Total Hip System; (3) not investigate other potential causes of the reported complications; (4) suspend sales or distribution; or (5) warn physicians and patients of the propensity of the Profemur® Total Hip System to generate dangerous and harmful metal debris in the patient's body; cause pain; inhibit mobility; fracture; and require revision surgery.

153.   As a direct, legal, proximate and producing result of the Defendants' negligent testing, manufacturing, marketing, selling, distribution, and promotion of the Profemur® Total Hip System, Plaintiff sustained injuries as set forth above.

41

154. Defendants' negligent design, warning, labeling, testing, manufacturing, marketing, selling, distributing, and promoting of the Profemur® Total Hip System implanted in Plaintiff was a substantial factor in Plaintiff's injuries and damages as set forth above.

## FOURTH CAUSE OF ACTION

### NEGLIGENCE – FAILURE TO RECALL/RETROFIT
### (As to all Defendants)

155. Plaintiff hereby realleges and incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 131, inclusive, as though fully set forth herein.

156. At all times relevant hereto, Defendants Wright and MicroPort knew or should have known that the design of the Profemur® Total Hip System and its warnings were dangerous or were likely to be dangerous when used in an intended or reasonably foreseeable manner.

157. Despite the severity and number of complaints Defendants Wright and MicroPort received, Defendants failed to recall, retrofit or warn patients or physicians about the danger of the Profemur® Total Hip System.

158. As a direct, legal, proximate and producing result of the Defendants' failure to recall the Profemur® Total Hip System, Plaintiff suffered injuries and damages as set forth above.

42

159. Defendants' failure to recall the Profemur® Total Hip System implanted in Plaintiff was a substantial factor in Plaintiff's injuries and damages as set forth above.

## FIFTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION
### (As to All Defendants)

160. Plaintiff repeats, realleged and hereby incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 131 above, inclusive, as though fully set forth herein.

161. Defendants had a duty to truthfully represent to the medical community, and to Plaintiff, Plaintiff's healthcare providers and the FDA, that the Profemur® Total Hip System had not been properly tested and not found to be safe and effective for its intended use.

162. Defendants knew or should have known that their representations that the Device was safe and effective were false and the representations regarding the safety and performance of the Profemur® Total Hip System was in fact, false.

163. Defendants failed to exercise ordinary care in determining the truth or falsity of their representations, and by misrepresenting the safety and performance of the Profemur® Total Hip System.

164.   Defendants breached their duty to present truthful representations by knowingly, or by want of ordinary care, misrepresenting the safety and performance of the Profemur® Total Hip System.

165.   As a direct, legal, proximate and producing result of Defendants' concealment of material facts, Plaintiff has suffered injuries as set forth herein.

## SIXTH CAUSE OF ACTION

### FRAUD BY CONCEALMENT
### (As to All Defendants)

166.   Plaintiff repeats, realleges and hereby incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 131 above, inclusive, as though fully set forth herein.

167.   Wright and MicroPort, as manufacturers of the Profemur® Total Hip System, were armed with superior knowledge of the latent dangers associated with the Device (namely corrosion, and fretting) and had a duty to communicate these dangers to Plaintiff and Plaintiff's implanting surgeon.

168.   Defendants had a duty to accurately and truthfully represent to the medical community, Plaintiff, and the public that Wright Medical Profemur CoCr modular neck, and the Wright Medical Profemur Total Hip System, had not been adequately tested and found to be safe and effective for the treatment of patients requiring a hip replacement.  Instead, the Defendants knew, but deliberately failed to communicate this to Plaintiff or Plaintiff's surgeon.

169.   Defendants had a duty to inform, but fraudulently concealed from the medical community, implanting orthopedic surgeon Dr. Johnston, Plaintiff, and the public that the Wright Medical Profemur CoCr modular neck coupled with the Wright Medical Profemur titanium modular stem in the Wright Medical Profemur Total Hip System had an unreasonable and dangerous risk of corroding, fretting, and causing bodily injury.

170.   Through the reporting of adverse events to Wright and MicroPort, and by reports from experts in metallurgy and biomechanics retained by Wright and MicroPort, Defendants knew of the risk of corrosion and subsequent adverse tissue reaction and resulting bodily injury present in the device implanted in Plaintiff but did not disclose this information. Neither Plaintiff nor Plaintiff's surgeon had this information, nor could they have discovered this information through reasonable diligence.

171.   The Defendants had a duty to communicate the increased risk and known failures associated with the device implanted in Plaintiff to Plaintiff and Plaintiff's surgeon.

172.   Plaintiff and Plaintiff's surgeon justifiably relied upon Defendants to communicate known risks and failures when making both the decision to implant the device and the appropriate course of treatment following Plaintiff's index surgery.

173.  Had Defendants accurately and truthfully represented to the medical community, Dr. Johnston, Plaintiff, and the public the material facts that it knew regarding the risks of the Profemur CoCr Modular Neck coupled with the Profemur titanium modular stem as part of the Profemur Total Hip System, Plaintiff and/or Plaintiff's healthcare provider(s) would not have utilized Defendants' Profemur Total Hip System.

174.  Had Defendants not fraudulently concealed the increased risk of corrosion, effects of corrosion, and the known failures of the device from Plaintiff or Plaintiff's surgeon, Plaintiff's injuries would have been avoided or limited.

175.  As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## SEVENTH CAUSE OF ACTION

### FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

176.  Plaintiff repeats, realleges, and incorporates by reference as if fully set forth herein the facts alleged in paragraphs 1-131 of this Complaint.

46

177. Defendants, as manufacturers and distributors of the Profemur® Total Hip System armed with superior knowledge regarding the latent defects and failure rates associated with the Device, had a duty to accurately and truthfully represent to the public, the medical community, Plaintiff, and Plaintiff's surgeon, the material facts that it knew regarding the risks of the Profemur CoCr modular neck coupled with the Wright Medical Profemur titanium modular stem as part of the Profemur® Total Hip System.

178. Defendants made false representations of material fact to Plaintiff and/or her healthcare providers as to the safety and efficacy of the Profemur CoCr modular neck coupled with the Wright Medical Profemur titanium modular stem in the Profemur Total Hip System.  Instead of disclosing the heightened risks of corrosion, fretting, fracture, failure, and permanent injury, Defendants represented:

    a) that there was no indication of an increased risk of adverse events due to taper junction fretting and corrosion,

    b) that lab testing guaranteed structural reliability and the absence of significant micromovement and absence of fretting corrosion;

    c) that product complaint data did not indicate an increased risk of corrosion for Profemur CoCr modular necks when coupled with Profemur titanium hip stems;

d) that, "[u]tilized in both primary and revision applications, the current [Profemur modular] neck design has been successfully employed to improve surgical outcomes with no reported failures";

e) that Profemur® CoCr modular necks would result in less fretting than occurred with titanium modular necks;

f) that Profemur® cobalt-chromium modular necks coupled with Profemur® stems showed a total absence of corrosion in an in vivo environment; and

g) that the Profemur Total Hip System, including its component parts, were safe and effective, and were safer and more effective than other treatments for hip replacements.

179.    Defendants knew that the above representations alleged were false, yet Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in these representations.

180.    Defendants made these false representations with the intent of defrauding and deceiving the medical community (including implanting surgeon Dr. Johnston), Plaintiff, and the public, and to induce the medical community, Plaintiff's implanting surgeon, Plaintiff, and the public to utilize the Profemur CoCr modular neck coupled with the Profemur titanium modular stem as part of the Profemur Total

Hip System.    Doing so constituted a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiff and the public.

181.    Plaintiff and her implanting orthopedic surgeon Dr. Johnston justifiably relied upon Defendants' false representations of material fact in deciding to utilize the Profemur Hip System, including the CoCr modular neck and titanium modular stem.

182.    Had Plaintiff or her healthcare providers known the true facts about the dangers and health risks of the Profemur CoCr modular neck coupled with the Profemur titanium modular stem as components of the Profemur Total Hip System, they would not have utilized these products.

183.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## EIGHTH CLAIM FOR RELIEF

### PUNITIVE DAMAGES
### (Against All Defendants)

184.    Plaintiff repeats, realleges, and incorporates by reference as if fully set forth herein the facts alleged in paragraphs 1-131 of this Complaint.

185.   Defendants knew or should have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury or damage to Plaintiff and continued the conduct with malice or in reckless disregard of the consequences and/or rights of Plaintiff, from which malice may be inferred. Defendants also made representations and/or concealed information in a fraudulent manner.  Accordingly, Plaintiff is entitled to an award of punitive damages.

## DAMAGES

186.   Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs 1-131 of this Complaint.

187.   As a direct and proximate result of the acts and omissions of the Defendant alleged herein, Plaintiff was injured and damaged.  The injuries and damages for which Plaintiff seeks compensation from Defendants includes, but are not limited to:

(a)   physical pain and suffering of a past, present and future nature;

(b)   emotional pain and suffering of a past, present and future nature;

(c)   permanent impairment and scarring;

(d)   medical bills and expenses of a past, present and future nature;

(e)   loss of enjoyment of life;

(f)   pre- and post-judgment interest;

(g)   statutory and discretionary costs;

50

(h)     punitive damages; and

(i)     any and all such other and further legal and equitable relief as the Court deems necessary, just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     For general damages for personal injuries to Plaintiff according to proof;

2.     For all past, current, and future medical and incidental expenses, according to proof;

3.     For all loss of earnings, present and future, and loss of earning capacity, according to proof;

4.     For punitive and/or exemplary damages in an amount sufficient to punish Defendants and deter similar conduct in the future, according to proof;

5.     For pre-judgment interest, as provided by law;

6.     For reasonable attorney's fees;

7.     For costs of litigation; and

8.     For such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury to the full extent permitted by law.

Dated:        March 30, 2022                    Respectfully submitted,

N. Kirkland Pope
Michael J. Blakely, Jr.
POPE McGLAMRY, P.C.
3391 Peachtree Road, NE, Suite 300
Atlanta, GA  30326
Ph: 404-523-7706
Fx: 404-524-1648
efile@pmkm.com

*Attorneys for Plaintiff Christine Jackson*